IN THE SUPREME COURT OF NORTH CAROLINA

No. 56PA17

Filed 7 December 2018

DR. ROBERT CORWIN AS TRUSTEE FOR THE BEATRICE CORWIN LIVING IRREVOCABLE TRUST, on Behalf of a Class of Those Similarly Situated

v.

BRITISH AMERICAN TOBACCO PLC, REYNOLDS AMERICAN, INC., SUSAN M. CAMERON, JOHN P. DALY, NEIL R. WITHINGTON, LUC JOBIN, SIR NICHOLAS SCHEELE, MARTIN D. FEINSTEIN, RONALD S. ROLFE, RICHARD E. THORNBURGH, HOLLY K. KOEPPEL, NANA MENSAH, LIONEL L. NOWELL, III, JOHN J. ZILLMER, and THOMAS C. WAJNERT

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, ___ N.C. App. ___, 796 S.E.2d 324 (2016), affirming in part and reversing and remanding in part an order and opinion entered on 6 August 2015 by Judge James L. Gale, Chief Special Superior Court Judge for Complex Business Cases, in Superior Court, Guilford County. Heard in the Supreme Court on 9 January 2018.

*Mullins Duncan Harrell & Russell PLLC, by Alan W. Duncan and Stephen M. Russell, Jr.; and Block & Leviton LLP, by Jason M. Leviton, pro hac vice, for plaintiff-appellee.*

*Robinson & Lawing, LLP, by H. Brent Helms; and Cravath, Swaine & Moore LLP, by Gary A. Bornstein, pro hac vice, for defendant-appellant British American Tobacco PLC.*

*Bell Davis & Pitt, P.A., by Alan M. Ruley and William K. Davis, for North Carolina Association of Defense Attorneys, amicus curiae.*

MARTIN, Chief Justice.

This appeal arises from the agreement of Reynolds American, Inc. to purchase Lorillard, Inc. Defendant British American Tobacco PLC (BAT) owned 42% of the stock in Reynolds and agreed to fund part of the Lorillard transaction by purchasing enough of the newly acquired shares to maintain that 42% ownership interest. The terms of this agreement diluted the voting power of Reynolds' other minority shareholders, including plaintiff Dr. Robert Corwin. Plaintiff then filed a putative class action suit on behalf of similarly situated stockholders asserting a claim for breach of fiduciary duty against, among others, BAT.

In this appeal, we consider whether BAT owed fiduciary duties to those other shareholders in the context of the Lorillard acquisition. The Business Court concluded that BAT did not owe fiduciary duties to the other shareholders and granted BAT's motion to dismiss. We agree with the Business Court and therefore reverse the decision of the Court of Appeals.

## I. Background

The matter before us is an appeal of a determination under Rule 12(b)(6) of the North Carolina Rules of Civil Procedure, so we accept all of the facts pleaded in plaintiff's First Amended Class Action Complaint (the operative pleading here, which we will hereinafter refer to as the Complaint) as true. *See Arnesen v. Rivers Edge Golf Club & Plantation, Inc.*, 368 N.C. 440, 448, 781 S.E.2d 1, 7 (2015) (quoting *Sutton*

*v. Duke*, 277 N.C. 94, 98, 176 S.E.2d 161, 163 (1970)). Our statement of the facts of this case is derived from the Complaint, as well as from other documents that the Complaint incorporates by reference.

Reynolds, an American tobacco company, was created after Reynolds' predecessor entity acquired Brown & Williamson (B&W), another tobacco company. B&W was a subsidiary of BAT, a tobacco holding company that is headquartered in London. As a result of the transaction, BAT became a 42% stockholder of Reynolds, and BAT and Reynolds entered into a governance agreement dated 30 July 2004 (the Governance Agreement).

The Governance Agreement contained specific limitations on BAT's power.[1] BAT could effectively nominate only five members to Reynolds' thirteen-member Board of Directors, and three of those nominees had to be "Independent Directors." The Governance Agreement defined the term "Independent Director" to mean a director who was considered independent of Reynolds under the New York Stock Exchange Rules[2] and who had not been a director, officer, or employee of BAT or its

---

[1] Most of the provisions of the Governance Agreement that we discuss here refer not to BAT but to its subsidiary, B&W. However, the Governance Agreement specifically provides that "B&W may assign, in its sole discretion, any of or all its rights, interests and obligations under this Agreement to BAT or any of its Subsidiaries that agrees in writing to be bound by the provisions hereof." We can find no portion of the record indicating that B&W made such an assignment to BAT, but, because the courts below and both parties to this appeal treat BAT as having assumed B&W's rights and obligations under the Governance Agreement, we also do so for the purpose of our decision here.

[2] This portion of the definition of the term "Independent Director" applies only if

subsidiaries within the past three years. Reynolds' Corporate Governance and Nominating Committee (the Committee) had the right to nominate the remaining eight directors, seven of whom had to be Independent Directors. All members of the Committee itself had to be Independent Directors, and, provided that the Reynolds board was fully staffed, the majority of those directors had to be non-BAT-nominated Independent Directors. During a standstill period imposed by the Governance Agreement,[3] BAT could not seek removal of any of the directors that it did not nominate, unless the Reynolds board amended or waived that limitation. Further, a majority of the Independent Directors who were not nominated by BAT had to approve any material transaction between, or involving, Reynolds and BAT (with certain narrow exceptions that no party asserts as being relevant here). These restrictions, along with the rest of the Governance Agreement, would continue until BAT's ownership interest reached 100% or fell below 15% (or until a person or group other than BAT, with some other exceptions not relevant here, owned or controlled

Reynolds is listed on the New York Stock Exchange. Because the Complaint alleges that Reynolds "trades on the New York Stock Exchange," though, that portion of the definition applies to the term for the purposes of this motion.

[3] The standstill period was set to run from 30 July 2004—the effective date of the Governance Agreement—until either the tenth anniversary of the Governance Agreement or the date on which a significant transaction occurred, whichever was earlier. According to the Governance Agreement, a significant transaction would be "any sale, merger, acquisition . . . , consolidation, dissolution, recapitalization or other business combination involving Reynolds American or any of its Subsidiaries pursuant to which more than 30% of the Voting Power or the consolidated total assets of Reynolds American would be acquired or received" by an outside party.

more than 50% of the voting power of all voting stock), at which point the Governance Agreement would terminate by its own terms.

Alongside these restrictions, the Governance Agreement conveyed certain contractual rights to BAT. The Governance Agreement required the approval of a majority of the BAT-nominated directors for certain actions such as stock issuances if that stock would have voting power greater than or equal to 5% of the voting power outstanding before that issuance. It also required the approval of BAT as a stockholder for certain actions such as the sale of specified intellectual property.

In September 2012, Reynolds, the second-largest tobacco company in the United States, began considering a merger with Lorillard, the third-largest tobacco company in the United States. Reynolds met with BAT before entering negotiations with Lorillard. BAT indicated that it would support the Lorillard merger only on terms that it approved of and expressed its desire to maintain its 42% ownership interest in Reynolds. BAT was willing to provide financing for the transaction through purchasing enough of the newly acquired shares to maintain its ownership interest, and the parties agreed to a term sheet regarding that financing. BAT insisted that this term sheet contain a provision that prevented BAT or Reynolds from seeking to change the Governance Agreement in connection with the proposed transaction. BAT also indicated that it was not willing to extend the standstill period specified in the Governance Agreement.

Initially, discussions proceeded toward what Lorillard hoped would be a merger of equals. The Other Directors—a term that the Governance Agreement defined (in its singular form) to mean an Independent Director of the Reynolds board who was not nominated by BAT—even discussed reducing BAT's ownership percentage after the merger to allow a greater ownership level for Lorillard's stockholders. But this change ultimately did not happen. Eventually, Lorillard terminated negotiations after concluding that the transaction was not truly a merger of equals given the power that BAT would wield over the combined company. Reynolds then decided to pursue an acquisition of Lorillard instead.

During subsequent negotiations, the Other Directors requested the removal of a provision in the proposed merger agreement that required BAT to vote its shares of Reynolds stock in favor of the transaction regardless of whether the Reynolds board changed its recommendation in favor of the transaction. Lorillard, however, insisted that this provision remain in the agreement. BAT said that it would consider Lorillard's demand but would not commit over the objections of the Other Directors. The Other Directors agreed to allow the provision to remain in the proposed merger agreement, so it did, in fact, remain there.

On 15 July 2014, the companies announced that they had reached a final agreement. Reynolds would purchase Lorillard and pay the Lorillard stockholders a combination of 0.2909 shares of Reynolds common stock plus $50.50 for each share of Lorillard stock that they owned. At the time, this price corresponded to a value of

$68.88 per Lorillard share based on the closing price of Reynolds stock on 14 July 2014.

To help finance the acquisition, Reynolds would divest a package of assets, including several cigarette brands, to Imperial Tobacco Group PLC. Additionally, BAT would help finance the acquisition by purchasing enough additional shares of Reynolds for it to maintain its 42% ownership of Reynolds after the completion of the transaction. BAT would be permitted to purchase these additional Reynolds shares for $60.16 per share—the price of Reynolds stock on 2 July 2014, which was also used to determine the stock component of the Lorillard shareholders' consideration. This price was $3.02 less than the closing price of Reynolds stock on 14 July 2014, the day before the transaction was executed. Reynolds and BAT also agreed to pursue a technology-sharing initiative for next-generation tobacco products such as digital vapor cigarettes. The entire Reynolds board, including the Other Directors, unanimously approved these transactions.[4]

In response to the announcement of these transactions, plaintiff Dr. Robert Corwin filed a class action complaint against BAT, Reynolds, and a group of Reynolds' directors (director defendants) in his capacity as trustee for the Beatrice Corwin Living Irrevocable Trust and on behalf of other stockholders similarly situated. The

---

[4] However, the Complaint indicates that plaintiff lacks specific information about whether a separate vote by the Reynolds board on the technology-sharing agreement occurred (or, by necessary implication, how the board voted if a vote did occur).

case was designated as a mandatory complex business case to be heard by the Business Court. The Complaint (which, again, is the operative pleading here) alleges, among other things, that BAT was a controlling stockholder of Reynolds, that BAT therefore owed fiduciary duties to plaintiff, and that BAT breached those fiduciary duties through its conduct in connection with the Lorillard transaction. Although BAT was not a majority stockholder of Reynolds, plaintiff bases his claim that BAT was nevertheless a *controlling* stockholder on various aspects of the Reynolds-BAT Governance Agreement and BAT's involvement in the Lorillard transaction. Plaintiff claims that BAT's control over Reynolds allowed BAT to negotiate benefits for itself that were not shared with other Reynolds stockholders.

BAT, Reynolds, and director defendants moved to dismiss plaintiff's Complaint. BAT argued that it was not a controlling stockholder of Reynolds and did not owe fiduciary duties to plaintiff under North Carolina law because it owned less than a majority of Reynolds stock. BAT also argued that plaintiff's claim was derivative and that plaintiff therefore lacked standing because he had not made a pre-suit demand on the Reynolds board, as North Carolina law requires before a plaintiff files a derivative suit. Plaintiff, on the other hand, urged the Business Court to adopt the standard that Delaware uses to determine whether a stockholder is a controlling stockholder, which would impose fiduciary duties on a minority stockholder who is found to be controlling.

The Business Court granted all of the defendants' motions to dismiss. Regarding BAT, the Business Court concluded that, even if the Delaware standard applied, the Complaint failed to allege that BAT exercised actual control over the Reynolds board regarding the transaction. In reaching this conclusion, the Business Court noted the "extraordinary" limitations that the Governance Agreement placed on BAT's ability to control the Reynolds board. Plaintiff appealed the dismissal of his claims to the Court of Appeals.

In a unanimous opinion, the Court of Appeals reversed the Business Court's dismissal of plaintiff's claims against BAT but affirmed the dismissal of plaintiff's claims against Reynolds and director defendants. *Corwin v. British Am. Tobacco PLC*, ___ N.C. App. ___, ___, 796 S.E.2d 324, 340 (2016). The Court of Appeals used the Delaware approach to determine whether BAT was a controlling stockholder and concluded that plaintiff alleged enough facts to support a reasonable inference that BAT was a controlling stockholder. *Id.* at ___, ___, 796 S.E.2d at 332, 337. The Court of Appeals also concluded that plaintiff had standing to bring a direct claim against BAT because plaintiff sufficiently pleaded that BAT owed plaintiff a special duty. *Id.* at ___, 796 S.E.2d at 338 (citing *Barger v. McCoy Hillard & Parks*, 346 N.C. 650, 658, 488 S.E.2d 215, 219 (1997)).

BAT petitioned this Court for discretionary review on various issues related to whether a minority stockholder could owe fiduciary duties to other stockholders under North Carolina law and whether the Court of Appeals correctly found that a

controlling stockholder necessarily owes a special duty to other stockholders for standing purposes. This Court allowed BAT's petition.

## II. Analysis

BAT moved to dismiss plaintiff's Complaint for lack of standing under Rule 12(b)(1) and for failure to state a claim under Rule 12(b)(6) of the North Carolina Rules of Civil Procedure. The Business Court assumed without deciding that plaintiff had standing, and then dismissed plaintiff's Complaint for failure to state any claim for breach of fiduciary duty. Nevertheless, we will consider the issue of standing before addressing the Rule 12(b)(6) issue because "standing is a 'necessary prerequisite to a court's proper exercise of subject matter jurisdiction.'" *Willowmere Cmty. Ass'n v. City of Charlotte*, 370 N.C. 553, 561, 809 S.E.2d 558, 563 (2018) (quoting *Crouse v. Mineo*, 189 N.C. App. 232, 236, 658 S.E.2d 33, 36 (2008)).

### *A. Standing*

The Court of Appeals concluded that plaintiff had standing to bring a direct claim against BAT because the Complaint contained enough allegations to support a determination that BAT owed a special duty to plaintiff. *Corwin*, ___ N.C. App. at ___, 796 S.E.2d at 338 (citing *Barger*, 346 N.C. at 658, 488 S.E.2d at 219). BAT argues, however, that plaintiff's claims are derivative and that plaintiff lacks standing because he failed to make a pre-suit demand on Reynolds. Because this appeal stems from a trial court's order granting a motion to dismiss under Rule

12(b)(1), we apply de novo review, accepting the allegations in the complaint as true and viewing them in the light most favorable to the non-moving party. *Mangum v. Raleigh Bd. of Adjustment*, 362 N.C. 640, 644, 669 S.E.2d 279, 283 (2008).

A derivative proceeding is defined as "a civil suit in the right of a domestic corporation." N.C.G.S. § 55-7-40.1 (2017). Before commencing a derivative proceeding, a stockholder must make a written demand "upon the corporation to take suitable action." *Id.* § 55-7-42 (2017). In line with this requirement, this Court has stated that "[t]he general rule is that '[s]hareholders . . . generally may not bring individual actions to recover what they consider their share of the damages suffered by [a] corporation.' " *Green v. Freeman*, 367 N.C. 136, 142, 749 S.E.2d 262, 268 (2013) (second alteration in original) (quoting *Barger*, 346 N.C. at 660, 488 S.E.2d at 220-21). There are two exceptions to this general rule: shareholders "may bring an individual action . . . when (1) 'the wrongdoer owed [them] a special duty' or (2) they suffered a personal injury 'distinct from the injury sustained by . . . the corporation itself.' " *Id.* at 142, 749 S.E.2d at 268 (second and third alterations in original) (quoting *Barger*, 346 N.C. at 659, 661, 488 S.E.2d at 219, 221).

The first exception applies when the wrongdoer owes a duty that is "personal to plaintiffs as shareholders and [is] separate and distinct from the duty defendant[ ] owe[s] the corporation," such as a fiduciary duty owed to the stockholders. *Barger*, 346 N.C. at 659, 488 S.E.2d at 220. In this case, whether plaintiff had standing to bring a direct claim under the first exception depends on whether BAT was a

controlling stockholder that owed plaintiff fiduciary duties. This issue is the same issue that we must decide in order to determine whether the Business Court properly dismissed plaintiff's Complaint under Rule 12(b)(6) for failure to state a claim. We will therefore determine whether plaintiff has standing under the second exception before addressing whether BAT owed plaintiff fiduciary duties, to ascertain whether it gives us an independent basis for asserting jurisdiction.

The second *Barger* exception applies when a plaintiff suffers an injury that is "distinct from the injury suffered by the corporation itself." *Green*, 367 N.C. at 144, 749 S.E.2d at 269 (quoting *Barger*, 346 N.C. at 661, 488 S.E.2d at 221). In this case, plaintiff asserts that he and the Reynolds stockholders other than BAT have been injured by the reduction of their percentage ownership of Reynolds. Before the transaction, BAT owned 42% of the outstanding shares, and plaintiff and other stockholders owned the remaining 58% of shares. Under the transaction agreement, however, former Lorillard stockholders would own approximately 15% of Reynolds shares, and BAT would be permitted to purchase additional shares to maintain its 42% ownership. That means that plaintiff and the other stockholders would only own 43% of Reynolds shares after the transaction. Plaintiff claims that this arrangement allowed BAT to "maintain[ ] its own ownership stake and control over [Reynolds] while diluting the stake of Plaintiff and the Class by means of the BAT Share Purchase." This dilution translates to a reduction in voting power for plaintiff and the other non-BAT stockholders, and that alleged injury affects the voting power of

plaintiff and the non-BAT stockholders rather than the corporation itself. We therefore conclude that plaintiff had standing to bring a direct claim against BAT under the second *Barger* exception due to the alleged dilution of plaintiff's voting power.

While this Court has never before addressed whether a stockholder can bring a direct claim for voting power dilution, caselaw from Delaware permits it, and we find that caselaw to be persuasive. In *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, the Supreme Court of Delaware held that whether an action is direct or derivative is determined by "(1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)[.]" 845 A.2d 1031, 1033 (Del. 2004) (en banc). Before *Tooley*, Delaware applied a "special injury" test, which *Tooley* rejected. *Id.* at 1038-39. At first glance, it might appear that Delaware precedent should therefore be irrelevant to our analysis, on the assumption that the special injury test that *Tooley* rejected is similar to our Court's current "distinct injury" exception under *Barger*. The special injury test in Delaware, however, was different than the distinct injury exception in North Carolina. The phrase "special injury" referred to a "wrong . . . inflicted upon the stockholder alone" and not shared by the other *stockholders, see id.* at 1037, whereas "distinct injury" in North Carolina means that the injury to the stockholder is distinct from the injury suffered by the *corporation, Green,* 367 N.C. at 144, 749 S.E.2d at 269. So the *Tooley* analysis, like

the second *Barger* exception, focuses on whether the stockholder suffered a harm that is distinct from the harm suffered *by the corporation*. Focusing on the stockholder's harm compared to the corporation's harm rather than on the harm of one stockholder compared to the harm of other stockholders makes sense because, as *Tooley* explained, "a direct, individual claim of stockholders that does not depend on harm to the corporation can also fall on all stockholders equally, without the claim thereby becoming a derivative claim." 845 A.2d at 1037.

The Supreme Court of Delaware has recognized in *In re Tri-Star Pictures, Inc., Litigation*, furthermore, that voting power dilution is a harm to stockholders when the minority stockholders' voting power is decreased while the majority stockholder's power is increased. 634 A.2d 319, 330 (Del. 1993). In *Tri-Star*, the Supreme Court of Delaware noted that the plaintiffs, who were minority stockholders, "suffer[ed] harm by voting power dilution which, in essence, is no more than a relative diminution in the minority's proportionate influence over corporate affairs." *Id.* The court further explained that "[v]oting power dilution is a harm distinct and separate from" other harms suffered by the minority stockholders, such as alleged nondisclosure in proxy materials, because "[t]he harm from voting power dilution goes to the impact of an individual stockholder's vote." *Id.* at 330 n.12. Although *Tri-Star* was decided before *Tooley*, Delaware courts, including the Supreme Court of Delaware, have continued to cite the pertinent analysis from *Tri-Star* while applying the *Tooley* test for distinguishing between direct and derivative claims. *See, e.g.,*

*Gentile v. Rossette*, 906 A.2d 91, 101-03 (Del. 2006) (noting that *Tri-Star* provides the "analytical framework" for claims based on dilution of stockholder voting power and then applying *Tooley* to determine that the claim at issue was direct rather than derivative because the harm to minority stockholders was unique from any injury suffered by the corporation and because the only available relief would exclusively benefit those minority stockholders).

Using the *Tooley* test, the Delaware Court of Chancery has determined that a claim of voting power dilution can be a direct claim "where a significant stockholder's interest is increased at the sole expense of the minority." *In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 808, 818 (Del. Ch. 2005) (quoting *In re Paxson Commc'n Corp. S'holders Litig.*, No. Civ.A. 17568, 2001 WL 812028, at *5 (Del. Ch. July 12, 2001)).[5] The Court of Chancery has explained that "[v]oting power dilution may constitute a direct claim, because it can directly harm the shareholders without affecting the corporation, and any remedy for the harm suffered under those circumstances would benefit the shareholders." *Oliver v. Boston Univ.*, No. Civ.A. 16570-NC, 2006 WL 1064169, at *17 (Del. Ch. Apr. 14, 2006) (unreported).[6]

---

[5] The Supreme Court of Delaware has likewise clarified that, although *Tri-Star* itself speaks of, and the facts in *Tri-Star* involved, a majority stockholder's power being increased, the *Tri-Star* rule applies when a "*significant or controlling* stockholder['s]" interest is increased. *See In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 766, 774-75 (Del. 2006) (en banc) (emphasis added) (quoting *In re Paxson*, 2001 WL 812028, at *5).

[6] Delaware allows unpublished cases to be cited as precedent. Stephen R. Barnett, *No-Citation Rules Under Siege: A Battlefield Report and Analysis*, 5 J. App. Prac. & Process

In this case, BAT's voting power did not increase, but it was allowed to remain constant at the sole expense of plaintiff and the other non-BAT stockholders, whose voting power significantly decreased. This voting power dilution did not harm the corporation itself, but it did harm the non-BAT stockholders. Thus, although this case is the first time that this Court has considered whether voting power dilution is a direct claim, we agree with the relevant reasoning of the Delaware courts that we have discussed, and hold that plaintiff has pleaded "a personal injury." *See Green*, 367 N.C. at 142, 749 S.E.2d at 268. We further hold that the alleged personal injury, in conjunction with plaintiff's legal claim that BAT breached a purported fiduciary duty to himself and his fellow non-BAT minority stockholders, is enough to confer subject-matter jurisdiction on this Court. Because we have concluded that plaintiff had standing to bring a direct claim for voting power dilution, we will now address whether the Business Court properly granted BAT's motion to dismiss under Rule 12(b)(6).

## B. Fiduciary Duties

On appeal from the dismissal of a complaint pursuant to North Carolina Rule of Civil Procedure 12(b)(6), we conduct de novo review to determine "whether the

---

473, 481 (2003). Specifically, the Rules of the Court of Chancery of the State of Delaware refer to both reported and unreported Delaware cases as "principal Delaware decisions" that can be included in a party's compendium of authorities for the court to review along with its brief. Del. Ch. Ct. R. 171(i). In ascertaining the nature of Delaware law, therefore, we cite both reported and unreported Delaware Court of Chancery cases throughout this opinion and consider them to have equal authority for the purposes of our analysis.

allegations of the complaint, if treated as true, are sufficient to state a claim upon which relief can be granted under some legal theory." *CommScope Credit Union v. Butler & Burke, LLP*, 369 N.C. 48, 51, 790 S.E.2d 657, 659 (2016) (quoting *Bridges v. Parrish*, 366 N.C. 539, 541, 742 S.E.2d 794, 796 (2013)). It is well established that dismissal pursuant to Rule 12(b)(6) is proper when "(1) the complaint on its face reveals that no law supports the plaintiff's claim; (2) the complaint on its face reveals the absence of facts sufficient to make a good claim; or (3) the complaint discloses some fact that necessarily defeats the plaintiff's claim." *Wood v. Guilford County*, 355 N.C. 161, 166, 558 S.E.2d 490, 494 (2002) (citing *Oates v. JAG, Inc.*, 314 N.C. 276, 278, 333 S.E.2d 222, 224 (1985)).[7]

This Court held in *Gaines v. Long Manufacturing Company* that the majority stockholder of a corporation owes fiduciary duties to the minority stockholders. 234 N.C. 340, 344, 67 S.E.2d 350, 353 (1951). This Court reasoned that majority stockholders owe fiduciary duties to minority stockholders because majority

---

[7] The dissent relies heavily on the Rule 12(b)(6) standard recited in cases such as *Turner v. Hammocks Beach Corp.*, 363 N.C. 555, 559, 681 S.E.2d 770, 774 (2009), and *State ex rel. Cooper v. Ridgeway Brands Mfg., LLC*, 362 N.C. 431, 444, 666 S.E.2d 107, 116 (2008), which, in turn, finds its genesis in *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S. Ct. 99, 102 (1957), *abrogated by Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955 (2007). We decline to address what admittedly may be a lack of doctrinal consistency in our standard of review for Rule 12(b)(6) motions when that question was not among "the issues stated in . . . the petition for discretionary review and the response thereto filed." N.C. R. App. P. 16(a). In any event, this Court routinely uses the Rule 12(b)(6) standard that we apply here in assessing the sufficiency of complaints in the context of complex commercial litigation. *See, e.g.*, *Krawiec v. Manly*, 370 N.C. 602, 606, 811 S.E.2d 542, 546 (2018); *Christenbury Eye Ctr., P.A. v. Medflow, Inc.*, 370 N.C. 1, 5, 802 S.E.2d 888, 891 (2017).

stockholders "have a community of interest with the minority holders in the same property and because the latter can act and contract in relation to the corporate property only through the former." *Id.* at 344, 67 S.E.2d at 353 (quoting 13 Am. Jur. *Corporations* § 423 (1938)). "It is the fact of control of the common property held and exercised . . . that creates the fiduciary obligation on the part of the majority stockholders in a corporation for the minority holders." *Id.* at 344-45, 67 S.E.2d at 353 (quoting 13 Am. Jur. *Corporations* § 423). Under *Gaines*, BAT did not necessarily owe fiduciary duties to the other stockholders because BAT was not a majority stockholder.

This Court has never held that a *minority* stockholder owes fiduciary duties to other stockholders, but it has also never held that a minority stockholder *cannot* owe fiduciary duties to other stockholders. We do not need to decide that question today, however. Even if we agreed with Delaware courts that a minority stockholder may owe fiduciary duties to other stockholders based on its exercising actual control over the board of directors, the complaint in this case would still fail to state a claim upon which relief can be granted because the Complaint does not adequately allege that BAT exercised actual control over the Reynolds board here.

In Delaware, "[i]t is well settled law that only a 'controlling stockholder' owes fiduciary duties to other stockholders." *In re Primedia Inc. Derivative Litig.*, 910 A.2d 248, 257 (Del. Ch. 2006) (citing *Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1113-14 (Del. 1994)). A stockholder is considered controlling if it owns more than

50% of the corporation's voting power *or* if it "exercises control over the business and affairs of the corporation." *Id.* (quoting *Kahn*, 638 A.2d at 1113 (emphasis omitted)). Put another way, a minority stockholder is considered a controlling stockholder if the minority stockholder exercises "domination . . . through actual control of corporate conduct." *In re Morton's Rest. Grp., Inc. S'holders Litig.*, 74 A.3d 656, 664 (Del. Ch. 2013) (quoting *Citron v. Fairchild Camera & Instrument Corp.*, 569 A.2d 53, 70 (Del. 1989)). This inquiry focuses on actual control over *the board of directors*. *Id.* at 664-65; *In re KKR Fin. Holdings LLC S'holder Litig.*, 101 A.3d 980, 993-94 (Del. Ch. 2014), *aff'd sub nom. Corwin v. KKR Fin. Holdings LLC*, 125 A.3d 304 (Del. 2015). Actual control exists only when the allegedly controlling stockholder "exercises such formidable voting and managerial power that [it], as a practical matter, [is] no differently situated than if [it] had majority voting control." *In re KKR*, 101 A.3d at 993 (alterations in original) (quoting *In re Morton's*, 74 A.3d at 665) (internal quotations omitted). As a necessary prerequisite for a minority stockholder to exercise actual control, then, the stockholder's "power must be so potent that independent directors . . . cannot freely exercise their judgment, fearing retribution." *Id.* (emphasis omitted) (quoting *In re Morton's*, 74 A.3d at 665 (alteration in original)) (internal quotations omitted).

To survive a motion to dismiss in Delaware, a claim for breach of fiduciary duty by a minority stockholder must contain more than "[t]he bare conclusory allegation that a minority stockholder possessed control . . . . Rather, the [c]omplaint must

contain well-pled facts showing that the minority stockholder '*exercised* actual domination and control over . . . [the] directors.' " *In re Morton's*, 74 A.3d at 664-65 (emphasis added) (fourth and fifth alterations in original) (quoting *In re Sea-Land Corp. S'holders Litig.*, No. Civ.A. 8453, 1988 WL 49126, at *3 (Del. Ch. May 13, 1988) (unreported)). Even at the motion to dismiss stage, Delaware courts have noted that "[t]his actual control test is 'not an easy one to satisfy' as 'stockholders with very potent clout have been deemed, in thoughtful decisions, to fall short of the mark.' " *Sciabacucchi v. Liberty Broadband Corp.*, No. CV 11418-VCG, 2017 WL 2352152, at *16 (Del. Ch. May 31, 2017) (unreported) (quoting *In re PNB Holding Co. S'holders Litig.*, No. Civ.A. 28-N, 2006 WL 2403999, at *9 (Del. Ch. Aug. 18, 2006) (unreported)).

That the actual control standard emphasizes the *exercise* of actual control over the board—an affirmative act by the minority stockholder—and not just the mere possession of power means that an allegation that a minority stockholder has some leverage over the board of directors is not enough. *See In re Sea-Land*, 1988 WL 49126, at *3 (stating that allegations that amount to significant "leverage" will not allow a complaint to survive because " 'leverage' is not actual domination and control"). A party may, after all, use its leverage to negotiate favorable terms in a transaction with another party even when it has *no* control (and thus has *exercised* no control) over that other party. Applying this standard in the context of a Rule 12(b)(6) motion, plaintiff's Complaint necessarily fails if it "reveals the absence of

facts" that BAT engaged in some affirmative act to direct or compel the Reynolds board to enter into the Lorillard transaction on the terms that plaintiff takes issue with here. *Wood*, 355 N.C. at 166, 558 S.E.2d at 494 (citing *Oates*, 314 N.C. at 278, 333 S.E.2d at 224). In other words, the complaint must allege, through well-pleaded facts, *actual control, see Sciabacucchi*, 2017 WL 2352152, at \*16, which refers to control that prevents a company's directors from "freely exercis[ing] their judgment in determining whether or not to approve and recommend" a transaction, *In re KKR*, 101 A.3d at 993.

In the same vein, the fact that a stockholder possesses contractual rights permitting it to restrict corporate action and thereby giving it leverage over board decisions does not necessarily mean that the stockholder is exercising actual control. *Thermopylae Capital Partners, L.P. v. Simbol, Inc.*, C.A. No. 10619-VCG, 2016 WL 368170, at \*13 (Del. Ch. Jan. 29, 2016) (unreported). Unexercised contractual rights alone, such as board veto power, do not equate to actual control over a board. *Williamson v. Cox Commc'ns, Inc.*, No. Civ.A. 1663-N, 2006 WL 1586375, at \*5 (Del. Ch. June 5, 2006) (unreported). Even a stockholder who *exercises* its contractual rights to further its own goals "is simply exercising [its] own property rights, not that of others, and is no fiduciary." *Thermopylae*, 2016 WL 368170, at \*14. For example, in *Superior Vision Services, Inc. v. ReliaStar Life Insurance Co.*, No. Civ.A. 1668-N, 2006 WL 2521426 (Del. Ch. Aug. 25, 2006) (unreported), the allegedly controlling stockholder had a contractual right to withhold its consent and effectively veto any

dividend payment that the board voted to approve, *id.* at *4. The stockholder exercised that right, but the Delaware Court of Chancery concluded that the stockholder was not controlling solely by virtue of "exercis[ing] a duly-obtained contractual right." *Id.* at *5. The court reasoned that to hold otherwise would mean that "any strong contractual right, duly obtained by a significant shareholder (a somewhat elusive term in itself), would be limited by and subject to fiduciary duty concerns." *Id.*

A minority stockholder who exercises contractual rights may, however, be considered a controlling stockholder if the stockholder "achieved control or influence over a majority of directors through non-contractual means." *Thermopylae*, 2016 WL 368170, at *14. Additionally, it could be possible to determine that a stockholder is a controlling one "where the holding of contractual rights [is] coupled with a significant equity position and other factors, . . . especially if those contractual rights are used to induce or to coerce the board of directors to approve (or refrain from approving) certain actions." *Superior Vision*, 2006 WL 2521426, at *5. In *Williamson v. Cox Communications, Inc.*, for example, the court found that unexercised veto power was significant in denying a motion to dismiss because the stockholder had veto power over *all* board decisions and could use that veto power "to shut down the effective operation of the . . . board of directors." 2006 WL 1586375, at *5. The veto power therefore gave that stockholder coercive leverage because the board effectively had to get the stockholder's approval in order to take any action whatsoever. *Id.* But "a

significant shareholder, who exercises a duly-obtained contractual right that somehow limits or restricts the actions that a corporation otherwise would take, does not become, without more, a 'controlling shareholder' for that particular purpose." *Superior Vision*, 2006 WL 2521426, at *5.

On the other hand, the existence of contractual *restrictions* on a stockholder's ability to exercise control may prevent a finding of control at the pleading stage. *See Sciabacucchi*, 2017 WL 2352152, at *17-18. In *Sciabacucchi v. Liberty Broadband Corp.*, for instance, contractual restrictions prevented the allegedly controlling stockholder from designating a majority of the board, soliciting proxies, or obtaining more than 35% of the voting stock. *Id.* at *18. The restrictions also required certain directors and unaffiliated stockholders to approve specific transactions like the one at issue. *Id.* The court concluded that these "contractual handcuffs," among other things, prevented a finding that the plaintiff had adequately pleaded actual control. *Id.* at *20.

Threats and demands, however, may support a claim that the stockholder exercised actual control. *See Kahn*, 638 A.2d at 1114. In *Kahn v. Lynch Communication Systems, Inc.*, the Supreme Court of Delaware affirmed the Court of Chancery's determination that a minority stockholder was controlling when the 43.3% stockholder threatened the board, saying, "[Y]ou must listen to us. We are 43 percent owner. You have to do what we tell you." *Id.* There was also evidence in *Kahn* that board members were intimidated by this stockholder and therefore

complied with its demands instead of exercising their own independent business judgment. *Id.* at 1114-15. Thus, *Kahn* suggests that allegations of a threat by a significant minority stockholder, plus allegations that the board was intimidated by that threat, may be enough to establish actual control.

As we have already said, we do not need to decide whether to adopt the Delaware approach to determining controlling-stockholder status in order to decide this case. Even under the Delaware approach, we conclude that plaintiff has failed to allege facts that, if true, would establish that BAT exercised actual control over the Reynolds board of directors, and therefore that plaintiff has failed to plead a breach-of-fiduciary-duty claim.

Plaintiff claims that the Governance Agreement gave BAT the ability to control the Reynolds board. In fact, the exact opposite is true. In several ways, the Governance Agreement placed "contractual handcuffs" on BAT that prevented it from controlling the Reynolds board. *See Sciabacucchi*, 2017 WL 2352152, at *20. BAT could nominate only five of the thirteen Reynolds directors, and three of those directors could not currently be (or have been in the past three years) an officer, director, or employee of BAT. Generally, BAT was required to vote all of its shares in favor of electing the directors that it did not nominate, and, if their removal was sought, BAT was required to vote all of its shares against their removal. And BAT could not seek to remove any of the directors that it did not nominate. BAT therefore had no means of retribution against the majority of the directors that could have

impaired the ability of those directors to exercise independent judgment. *See In re KKR*, 101 A.3d at 993-94. BAT also could not increase its ownership percentage during the standstill period, which was in effect when this transaction occurred. And the Other Directors who were not nominated by BAT or recently affiliated with BAT had to approve this transaction in a separate vote—which they did unanimously.

Plaintiff argues that BAT's contractual approval rights over the issuance of shares and the sale of intellectual property in this transaction gave BAT actual control, but contractual approval rights do not equate to actual control. *Superior Vision*, 2006 WL 2521426, at *4-5. Although BAT could stop this transaction from happening, BAT could not *make* it happen. To be a controlling stockholder, the minority stockholder must have "such formidable voting and managerial power that [it], as a practical matter, [is] no differently situated than if [it] had majority voting control." *In re PNB*, 2006 WL 2403999, at *9. Merely being able to stop a transaction does not give a minority stockholder the same level of power that a majority stockholder would have, because a majority stockholder would have the power both to stop a transaction *and to make it happen*. *See Gaines*, 234 N.C. at 344, 67 S.E.2d at 353 (noting that a majority stockholder has "the power, by the election of directors and by the vote of [its] stock, to do everything that the corporation can do" (quoting 13 Am. Jur. *Corporations* § 422)). Although a minority stockholder with veto power might be able to exercise that same level of power through coercion, *see Williamson*, 2006 WL 1586375, at *5, merely having veto power over the Board's ability to enter

into this particular transaction is not enough. To be clear, plaintiff does not allege that Reynolds *had to* enter into this transaction—much less to enter into this transaction as it was structured, which is what triggered BAT's contractual right to veto it. So the fact of BAT's contractual rights did not, on its own, give BAT the kind of coercive power over the Reynolds board that could allow BAT to exercise actual control. *Cf. Kahn*, 638 A.2d at 1112-13 (noting that the Lynch board had determined that Lynch needed to obtain certain technology to remain competitive and that Lynch's "alternatives to [the] cash-out merger" that its significant stockholder Alcatel had proposed "had been investigated but were impracticable").

As we have already said, of course, a stockholder who holds contractual rights could be considered a controlling stockholder "where the holding of contractual rights [is] coupled with a significant equity position and other factors." *Superior Vision*, 2006 WL 2521426, at *5. But as we discuss more fully below, plaintiff has failed to plead sufficient "other factors" to support such a finding in this case.

Plaintiff claims that BAT's involvement in the negotiations demonstrates actual control. Plaintiff does not allege that BAT ever threatened the Reynolds board in any way, however—unlike, for example, the stockholder who was considered controlling in *Kahn*, 638 A.2d at 1114-15—even though BAT was involved in many of the discussions regarding the Lorillard transaction from an early date. Admittedly, BAT did represent that it would support the transaction only on terms that were agreeable to BAT. BAT wanted to maintain its 42% ownership interest after the

transaction and did not want the transaction to affect the terms of the Governance Agreement, but in expressing that, BAT was making a statement only about exercising its veto power. And a statement that does not express the intent to do anything other than exercise veto power does not make BAT a controlling stockholder, because, in making that statement, BAT was merely informing the board of how it would exercise its contractual rights—rights that were the property of BAT alone and that could not turn BAT into a fiduciary. *See Thermopylae*, 2016 WL 368170, at *14.

Plaintiff also alleges that BAT had additional leverage in the transaction due to the threat that BAT would buy the remaining 58% of Reynolds' shares at the expiration of the standstill. But the Complaint does not actually allege that BAT ever threatened to do that. It merely refers to news outlet reports that speculated that BAT would buy the remaining shares at that time: specifically, to a report from the *Telegraph* stating "that Citigroup analysts had 'talked up the likelihood' that BAT would buy the remaining 58% of Reynolds" and to a report from the *Daily Mail* that there was "growing speculation [that BAT] is ready to splash out billions of pounds buying the 58 per cent of US rival Reynolds American it does not already own." And the Complaint alleges that the CEO of BAT told stockholders at its 2014 annual stockholder meeting "that BAT looks at acquiring Reynolds on a yearly basis." Accepting these allegations in the complaint as true merely requires us to accept that the *Telegraph* and the *Daily Mail* reported on this "speculation" and that BAT's CEO

told stockholders that BAT considered acquiring Reynolds every year. None of these allegations, if taken as true, indicate that BAT was actually planning to acquire Reynolds, or, more importantly, that BAT had actually threatened Reynolds with the idea of purchasing the remaining shares at the expiration of the standstill if BAT's preferences were not accommodated. And, more generally, taking as true plaintiff's allegation that "[t]he threat of a complete takeover gave BAT additional leverage to impose its terms on the Reynolds Board during [ ] negotiations," we must note again that the mere existence of leverage does not equate to the exercise of actual control. *See In re Sea-Land*, 1988 WL 49126, at *3. Where, as here, the "threat" to which a complaint refers is the mere *ability* to take over a company, that ability does not amount to actual control because it does not involve a stockholder who *prevents* board members from exercising their own independent judgment.

Plaintiff suggests in the complaint that the board was not independent of BAT in this transaction for other reasons. Plaintiff claims that the Other Directors—who were not nominated by BAT or recently affiliated with BAT—did not engage independent legal counsel soon enough and should have also engaged independent financial advisors. Plaintiff alleges that there is no evidence that Reynolds explored other financing options until just weeks before the transaction was executed. Plaintiff also suggests that many of Reynolds' directors had conflicts of interest in the transaction because seven of the directors were either current or former officers, directors, or attorneys for BAT or its affiliates. And, at times, BAT-appointed

Reynolds directors even spoke on behalf of BAT during meetings about the proposed transactions, according to plaintiff's allegations.

But, aside from the fact that any BAT nominees representing BAT's interests to the board were necessarily in the minority, the presence of board members who merely share interests with a significant stockholder does not give that stockholder actual control of the board; the proper focus is on whether the allegedly controlling stockholder exercised power over the board rather than on whether the directors had conflicts of interest. *See Sciabacucchi*, 2017 WL 2352152, at *17. To the extent that plaintiff relies on any of the above actions by the directors to state that BAT exercised actual control over the board, moreover, plaintiff's allegations are insufficient because plaintiff does not allege any act by BAT to direct, compel, or coerce the actions of the directors. As to the claim at issue here, after all, plaintiff is claiming a breach of fiduciary duty *by BAT*, not by any of the Reynolds directors (whether they be directors designed by or otherwise connected to BAT or not).

The dissent's reliance on plaintiff's allegations that the board failed to obtain outside and independent advice and counsel is marked by the same erroneous reasoning. Even if the Reynolds board should have engaged, but failed to engage, independent counsel, or otherwise failed to comply with its own legal obligations (which we take no position on), that would in no way show that BAT "prevent[ed] the . . . board from freely exercising its independent judgment in considering the [transaction]." *In re KKR*, 101 A.3d at 995. Plaintiff cannot simply allege that the

Reynolds board failed to comply with all of its legal duties (assuming, for the sake of argument, that he has at least done that); he must allege facts that would show that *BAT* prevented the board from *acting independently*. He has failed to do so.

Plaintiff points to recommendations of the Other Directors that were ultimately rejected as further evidence that BAT had actual control over the board. During negotiations, the Other Directors discussed reducing BAT's ownership percentage after the merger to allow a greater ownership level for Lorillard's stockholders, but this change ultimately never happened. Plaintiff does not allege any facts showing that the ultimate rejection of this change was due to BAT's intervention, though; the mere fact that this change was considered and rejected does not mean that BAT had actual control of the board. And even if BAT *had* influenced the decision on this particular aspect of the transaction, that does not mean that BAT exerted actual control over the board with respect to the transaction as a whole. Once again, its influence on the decision would be readily explained by BAT's leverage over the transaction, as a major financer of the transaction and as a holder of contractual rights implicated by the transaction. Because that leverage did not equate to actual control over the Reynolds board with respect to the transaction, anything that arose from that leverage does not equate to actual control, either.

Similarly, the Other Directors sought to remove a provision in the proposed merger agreement that required BAT to vote its shares of Reynolds stock in favor of the transaction regardless of whether the Reynolds board changed its

recommendation on the transaction. Lorillard, however, insisted that the provision remain in the agreement. Far from controlling this decision, BAT said that it would not commit to the provision over the objections of the Other Directors. The Other Directors ultimately agreed to allow the provision to remain in the proposed merger agreement, though, and remain it did. This change, then, was not rejected because of BAT's control over the Reynolds board. Instead, it was rejected because of Lorillard's demands and the Other Directors' acquiescence to those demands. Anyway, it is unclear why plaintiff thinks that the retention of this provision is helpful to his cause. All that the provision did was to *restrict* BAT's ability to freely decide whether to vote in favor of the transaction.

To the extent that plaintiff argues that terms in the agreement that are favorable to BAT demonstrate control, those arguments also fail. It is reasonable to infer, based on the pleadings, that Reynolds wanted BAT's support for the transaction and that BAT had some leverage because of the number of shares that it owned and its willingness to help finance the transaction (and because BAT could veto a transaction that, like the one proposed, was structured in a way that stock representing over 5% of Reynolds' stockholders' voting power had to be issued). Leverage is not the same as actual control, though, and does not, on its own, transform a minority stockholder into a controlling stockholder. *See In re Sea-Land*, 1988 WL 49126, at *3.

At best, the allegations that some terms in the transaction agreement were favorable to BAT show only that BAT's contractual rights gave it the ability to secure some favorable terms from the board. Those allegations do not show that BAT exercised *control* over the board—that is, to make it take action. If they did, then every contractual right that allowed a stockholder to exert some leverage over a transaction would automatically convert the stockholder into a controlling stockholder. That, in turn, would contravene the principle that a "contractual right . . . , without more," does not turn "a significant shareholder" into "a 'controlling shareholder.'" *Superior Vision*, 2006 WL 2521426, at \*5.

The terms of the agreement allowed BAT to maintain its 42% ownership interest in Reynolds by purchasing shares at a rate lower than the closing price for Reynolds shares the day before the transaction agreements were signed. That purchase price was based on the closing price of Reynolds stock on 2 July 2014, which was the date used to set the financial terms of the acquisition. Setting the purchase price ahead of time makes sense because Reynolds would have needed to know how much money it would receive from BAT in order to secure the rest of the financing required to complete the transaction. Further, using this date allowed the purchase price to be set before news of the proposed transaction was publicly released and affected stock prices. This term of the agreement therefore does not indicate actual control.

Reynolds and BAT also agreed to pursue a technology-sharing initiative for next generation tobacco products such as digital vapor cigarettes. Plaintiff alleged that "the Director Defendants . . . agreed to allow BAT to access Reynolds'[ ] game-changing technology without adequate compensation," thereby removing any "need for BAT to pay the Public Shareholders a control premium to buy the rest of the Company." But it is unclear how this agreement demonstrates that BAT had actual control of the Reynolds board with respect to the transaction to purchase Lorillard. The dissent points to the perceived threat of a takeover by BAT and to the allegation that this technology-sharing agreement made Reynolds a "significantly less attractive takeover target for BAT" and contends that these allegations, taken as true, show that BAT exercised actual control over the board. Again, though, leverage to obtain favorable terms in an agreement does not necessarily indicate that the beneficiary of those favorable terms was a controlling stockholder.

Overall, plaintiff's allegations and the incorporated Governance Agreement demonstrate that BAT did not have majority voting power either on the board or as a stockholder, that BAT could not retaliate against the non-BAT appointed directors who made up a majority of the board, and that the Lorillard transaction could not be approved without the separate approval of the Other Directors, who were Independent Directors not nominated by BAT. Because of these facts, BAT could not and did not exercise actual control over the Reynolds board. Additionally, plaintiff has filled his Complaint with allegations of BAT's leverage and bargaining power—

contractual or otherwise—and has also demonstrated that BAT was able to obtain favorable terms for itself during Reynolds' acquisition of Lorillard. But again, BAT's having bargaining power and negotiating a good deal because of it does not mean that BAT engaged in any coercive behavior or otherwise exercised actual control over the board.

Considering the restrictions in the Governance Agreement that we discuss above, and considering the absence of allegations of coercive or otherwise controlling actions on the part of BAT, plaintiff has failed to allege that BAT exercised such domination and control over the Reynolds board that BAT was indistinguishable from a majority stockholder. *See In re KKR*, 101 A.3d at 993-94. Under the Delaware controlling-stockholder standard, therefore, plaintiff's Complaint "on its face reveals the absence of facts sufficient to make a good claim" that BAT owed plaintiff fiduciary duties because it controlled the Reynold's board, and it also "discloses some fact[s] that necessarily defeat[ ] the plaintiff's claim" that BAT could even exercise such control. *Wood*, 355 N.C. at 166, 558 S.E.2d at 494 (citing *Oates*, 314 N.C. at 278, 333 S.E.2d at 224).

## III. Conclusion

For the reasons stated above, the Court of Appeals erred in concluding that plaintiff's allegations, if true, would satisfy the actual control test as that test is elucidated in Delaware caselaw. Because BAT was not a majority or controlling

stockholder, it did not owe fiduciary duties to the other Reynolds stockholders, and the Business Court properly dismissed plaintiff's breach-of-fiduciary-duty claim against BAT. We accordingly reverse the decision of the Court of Appeals on this issue. Plaintiff has not appealed the dismissal of his claims against defendant directors or Reynolds to this Court. The dismissal of those claims is therefore not before us, and the decision of the Court of Appeals as to those claims remains undisturbed.

REVERSED.

Justice HUDSON dissenting.

Here the majority concludes that plaintiff's complaint fails to adequately allege actual control by BAT over the Reynolds board of directors in the context of the Lorillard acquisition and that, as a result, we need not decide whether, in accordance with Delaware courts that have addressed the issue, "a minority stockholder may owe fiduciary duties to other stockholders based on its exercising actual control over the board of directors." Accordingly, the majority holds that the Business Court properly dismissed plaintiff's breach of fiduciary duty claim against BAT. In my opinion the complaint sufficiently alleges actual control by BAT; therefore, I would proceed to address whether this Court follows the Delaware approach on the issue of whether a minority stockholder who exercises actual control over the board of directors owes fiduciary duties to other stockholders. As such, I respectfully dissent.

The relevant inquiry in reviewing a trial court's ruling on a motion to dismiss under Rule 12(b)(6) is "whether, as a matter of law, the allegations of the complaint, treated as true, are sufficient to state a claim upon which relief may be granted." *Newberne v. Dep't of Crime Control & Pub. Safety*, 359 N.C. 782, 784, 618 S.E.2d 201, 203 (2005) (quoting *Meyer v. Walls*, 347 N.C. 97, 111, 489 S.E.2d 880, 888 (1997)). Under N.C.G.S. 1A-1, Rule 8(a)(1) (2017), a complaint must contain "[a] short and plain statement of the claim sufficiently particular to give the court and the parties

*notice* of the transactions, occurrences, or series of transactions or occurrences, intended to be proved showing that the pleader is entitled to relief." (Emphasis added.) "The system of notice pleading affords a sufficiently liberal construction of complaints so that few fail to survive a motion to dismiss." *Wray v. City of Greensboro*, 370 N.C. 41, 46, 802 S.E.2d 894, 898 (2017) (quoting *Ladd v. Estate of Kellenberger*, 314 N.C. 477, 481, 334 S.E.2d 751, 755 (1985)); *see also id.* at 50, 802 S.E.2d at 900 ("In light of the low bar for notice pleading under Rule 12(b)(6), . . . the averments in plaintiff's first amended complaint are sufficient . . . ."). "The complaint should be liberally construed and should not be dismissed 'unless it appears beyond doubt that the plaintiff could prove no set of facts in support of his claim which would entitle him to relief.'" *Turner v. Hammocks Beach Corp.*, 363 N.C. 555, 559, 681 S.E.2d 770, 774 (2009) (quoting *State ex rel. Cooper v. Ridgeway Brands Mfg., LLC*, 362 N.C. 431, 444, 666 S.E.2d 107, 116 (2008) (brackets omitted)); *see also id.* at 559, 681 S.E.2d at 774 (stating that the complaint must be viewed "in the light most favorable to plaintiffs, giving them the benefit of every reasonable inference that can be drawn therefrom"). "We review appeals from dismissals under Rule 12(b)(6) de novo." *Arnesen v. Rivers Edge Golf Club & Plantation, Inc.*, 368 N.C. 440, 448, 781 S.E.2d 1, 8 (2015) (citing *Bridges v. Parrish*, 366 N.C. 539, 541, 742 S.E.2d 794, 796 (2013)).

I agree with much of the majority's discussion of the Delaware approach, under which a minority stockholder is considered to be a controlling stockholder—therefore owing fiduciary duties to other stockholders—if the minority stockholder exercises

"domination . . . through actual control of corporate conduct."  *In re Morton's Rest. Grp. S'holders Litig.*, 74 A.3d 656, 664 (Del. Ch. 2013) (quoting *Citron v. Fairchild Camera & Instrument Corp.*, 569 A.2d 53, 70 (Del. 1989)); *see also id.* at 664-65 ("[T]he Complaint must contain well-pled facts showing that the minority stockholder 'exercised actual domination and control over . . . [the] directors.' " (second and third alterations in original) (quoting *In re Sea-Land Corp. S'holders Litig.*, Civ.A. No. 8453, 1988 WL 49126, at *384 (Del. Ch. May 13, 1988))).  A complaint must allege facts from which it is reasonable to infer that the allegedly controlling stockholder could "prevent the [company's] board from freely exercising its independent judgment in considering the [transaction] or . . . exact retribution by removing the [company's] directors from their offices."  *In re KKR Fin. Holdings LLC S'holder Litig.*, 101 A.3d 980, 995 (Del. Ch. 2014), *aff'd sub nom. Corwin v. KKR Fin. Holdings LLC*, 125 A.3d 304 (Del. 2015).  A plaintiff is not required to plead actual control by a minority stockholder of the "day-to-day operations" of the board of directors; rather, a "[p]laintiff can survive the motion to dismiss by alleging actual control with regard to the particular transaction that is being challenged."  *Williamson v. Cox Commc'ns, Inc.*, No. Civ.A. 1663-N, 2006 WL 1586375, at *4 (Del. Ch. June 5, 2006) (citing *In re W. Nat'l Corp. S'holders Litig.*, No. 15927, 2000 WL 710192, at *20 (Del. Ch. May 22, 2000)); *see also Super. Vision Servs. v. ReliaStar Life Ins. Co.*, No. Civ.A. 1668-N, 2006 WL 2521426, at *4 (Del. Ch. Aug. 25, 2006) (explaining that "pervasive control over the corporation's actions is not required" and a plaintiff can allege " 'actual control

with regard to the particular transaction that is being challenged' " (quoting

*Williamson*, 2006 WL 1586375, at \*4)).

Here the allegations of control are "with regard to a particular transaction that

is being challenged"—the Lorillard acquisition. Among the allegations that in my

view sufficiently allege actual control by BAT are the following[1]:

> 5. As a July 15, 2014 CNBC story put it, "the real victor" in the Proposed Transaction is neither Reynolds nor Lorillard, but BAT, which "***solidified its position in a larger company without paying a premium.***" The Proposed Transaction enriches BAT by extracting and transferring value from all other Reynolds shareholders (the "Public Shareholders") to BAT. As a result of the Proposed Transaction, the Public Shareholders will not only lose out on the economic value of the "game changing" e-cigarette and heat-not-burn technology being transferred to BAT, but their share of the combined company will be notably diluted and they will lose out on the control premium that BAT should have been required to pay to maintain its effective control over the Company.
>
> . . . .
>
> 34. In addition to the power to designate five board members, the Governance Agreement gives BAT significant additional means by which it exerts control over Reynolds. For example, as Reynolds disclosed in its most recent Form 10-K, BAT has a veto over "the sale or transfer of certain RAI intellectual property associated with B&W brands having an international presence, other than in connection with a sale of [Reynolds]; and [Reynolds's] adoption of any takeover defense measures that would apply to the acquisition of equity securities of Reynolds by

---

[1] Allegations pertaining to the threat of takeover are summarized with that part of the discussion below.

[BAT] or its affiliates, other than the re-adoption of the [Reynolds] rights plan in its present form." Moreover, "the approval of a majority of [BAT's] designees on [Reynolds's] Board is required in connection with the following matters: any issuance of [Reynolds] securities in excess of 5% of its outstanding voting stock, unless at such time [BAT's] ownership interest in [Reynolds] is less than 32%; and any repurchase of [Reynolds] common stock, subject to a number of exceptions, unless at such time [BAT's] ownership interest in [Reynolds] is less than 25%."

35.     Finally, the mere size of BAT's stake gives it significant control over Reynolds. As the Preliminary Proxy notes, "[u]nless substantially all RAI shareholders other than BAT vote together on matters presented to RAI shareholders, BAT would have the power to determine the outcome of matters submitted to a shareholder vote, which could result in RAI taking actions that RAI's other shareholders do not support."

36.     The Governance Agreement will terminate, however, if BAT owns either 100% or less than 15% of Reynolds. The Governance Agreement will also terminate, automatically, if a third party acquires a majority stake in Reynolds.

. . . .

41.     Reynolds's release also disclosed that BAT would receive two significant benefits stemming from the Proposed Transaction that were not shared with Public Shareholders: (i) the Technology Sharing Agreement will give BAT access to Reynolds's "game-changing" e-cigarette technology; and (ii) the BAT Share Purchase will allow BAT to maintain its pre-acquisition share of the Company and avoid being diluted along with the Public Shareholders by purchasing new shares at a discount to the Company's trading price:

> . . . . **As part of the transaction, BAT will maintain its 42 percent ownership in**

**RAI through an investment of approximately $4.7 billion (based on RAI's closing share price of $60.16 as of July 2, 2014, the same share price used to determine the stock component of Lorillard shareholders' consideration).**

**In addition, RAI and BAT have agreed in principle to pursue an ongoing technology-sharing initiative for the development and commercialization of next-generation tobacco products, including heat-not-burn cigarettes and vapor products.**

. . . .

### C. BAT's De Facto Control Over the Reynolds Board Enabled It To Dominate The Board's Decision Making Process

42. The "Background of the Merger" section in the Form S-4 that Reynolds filed with the Securities and Exchange Commission on October 17, 2014 (the "Preliminary Proxy") underscores that the Proposed Transaction was driven by the interests of BAT, at the expense of the Public Shareholders.

43. BAT was involved in the negotiation of the Proposed Transaction from the beginning. According to the Preliminary Proxy, Reynolds met with BAT before it presented any proposal to Lorillard or Imperial. In discussions between Reynolds and BAT in January 2013, BAT's representatives made clear that BAT would dictate the terms of any transaction:

BAT's representatives reiterated BAT's support, as a RAI shareholder, for a business combination of RAI and Lorillard. They also indicated BAT would wish to maintain its approximately 42% beneficial ownership

interest in RAI after the transaction and was willing to provide equity financing for such a transaction in order to maintain its ownership interest. BAT's representatives also stated that decisions as to whether and how to pursue a business combination between RAI and Lorillard were to be made by the RAI board of directors, but that BAT, in its capacity as a substantial financing source and holder of contractual approval rights, would cooperate with combining the companies only on transactional terms and with an execution strategy of which it approved. Such issues included, among others, the brands to be divested, the subscription price for any additional BAT investment, maintaining the terms of the governance agreement, avoiding a RAI commitment to pay any material 'reverse termination fee' due to the failure to obtain regulatory clearance and an executive succession plan for the combined company.

44. In June 2013, BAT and RAI agreed to a term sheet "with respect to the subscription by BAT for additional shares of RAI common stock in order to provide financing for the potential transaction involving RAI and Lorillard and to maintain BAT's approximately 42% beneficial ownership interest in RAI" (the "2013 Term Sheet"). At "the insistence of BAT," the 2013 Term Sheet included a provision "that neither BAT nor RAI would seek any changes in the governance agreement in connection with the possible acquisition of Lorillard." The Preliminary Proxy does not disclose any other material terms of the 2013 Term Sheet.

45. According to the Preliminary Proxy, the 2013 Term Sheet was approved by a vote of "the independent directors of RAI [*i.e.*, directors who are neither officers nor employees of Reynolds] not designated by B&W, referred to as the Other Directors." Yet there is no indication in the

Preliminary Proxy that the Other Directors hired independent counsel or an independent financial advisor to assist them in evaluating or negotiating the 2013 Term Sheet.

46.    Indeed, it does not appear that the Other Directors played any significant role in the negotiations with BAT over the 2013 Term Sheet.  Rather, according to the Preliminary Proxy, the Board established a strategic matters review committee ("SMRC"), which existed and operated on behalf of Reynolds from September 2012 to May 2014.  The Preliminary Proxy does not disclose the members of the SMRC.  Between September 2012 and the signing of the 2013 Term Sheet in June 2013, Reynolds's primary negotiator was Daniel M. Delen, the then-CEO of Reynolds.  Mr. Delen worked for BAT from 1989 through 2006.

47.    Later in the summer of 2013, "representatives of BAT indicated to representatives of RAI that BAT was not prepared to provide financial support to a transaction that would include a divestiture of the 'e-vapor' brand blu, as requested by Imperial, although eventually it changed its position."  Reynolds and BAT then worked hand-in-hand to negotiate the divestments.  According to the Preliminary Proxy, "[i]n July 2013, with the support of the RAI board of directors, [Thomas R.] Adams [an RAI executive], along with Scott M. Hayes, then group head of mergers & acquisitions for BAT, contacted representatives of another potential divestiture partner to inquire about the possibility of such party's participation in a brand divestiture transaction."

48.    Mr. Hayes continued to function as a de facto member of the Reynolds team.  According to the Preliminary Proxy, on November 21, 2013, Reynolds's SMRC met with "representatives of RAI's senior management, [Reynolds's legal advisors] Jones Day, [and] Richards Layton and [Reynolds's financial advisor] Lazard.  Mr. Hayes also participated in part of the meeting."  And, "[a]t the request of the SMRC, Mr. Hayes presented BAT's

view of a possible transaction with Lorillard and expressed BAT's support for such a transaction."

49. BAT continued to give strong direction to the Reynolds Board. On December 4 and 5, 2013, "the RAI board of directors met . . . with representatives of Jones Day, Richards Layton and Lazard. . . . Representatives of BAT provided BAT's view of the potential transaction, including BAT's belief that the transaction was value enhancing for all RAI shareholders and important from a competitive perspective and that, given the status of discussions with Imperial, BAT supported renewing contact with Lorillard." After that presentation, "the RAI board of directors authorized Mr. Wajnert to contact Mr. Kessler [Lorillard's Chairman and CEO] to explore the possibility of a potential transaction between RAI and Lorillard on the terms reviewed at the meeting."

50. According to the Preliminary Proxy, on December 19, 2013, Mr. Wajnert conveyed the following proposal to Mr. Kessler:

- the proposed business combination would be a market based transaction structured in a manner similar to a 'merger-of-equals,' in which Lorillard shareholders would receive consideration consisting of a mix of cash and stock at market value without a premium and both Lorillard's and RAI's shareholders would realize future value creation through the realization of meaningful synergies and changed market dynamics;

- BAT would maintain a significant beneficial ownership interest in the combined company, including through an investment of approximately $4.5 billion in cash at the consummation of the proposed business combination transaction;

- the leadership and governance of the combined company would be structured as a balance between the two organizations, subject to BAT's expressed desire to preserve its right to designate five members to the board of directors of the combined company (three of whom would be required to be independent of both BAT and the combined company); and

- in connection with a proposed business combination, RAI's subsidiaries' WINSTON, SALEM and KOOL and Lorillard's Maverick cigarette brands and Lorillard's 'e-vapor' brand blu (including SKYCIG) would be divested to Imperial in an effort to enhance the receipt of antitrust clearance from the regulatory authorities.

51. After discussions amongst the Lorillard Board, Mr. Kessler contacted Mr. Wajnert on January 11, 2014 to inform him that "while the Lorillard board of directors was potentially interested in the strategic and long-term financial aspects of a potential business combination between the companies, they did not think the RAI proposal provided sufficient value to Lorillard shareholders. Mr. Kessler indicated, however, that the Lorillard board of directors was willing to explore a business combination that was structured like a 'merger-of-equals' if the key terms were improved[.]"

52. According to the Preliminary Proxy, the Reynolds Board met by phone on January 14, 2014. At that meeting, "[a] representative of Lazard reported that he had contacted representatives of UBS Limited and Deutsche Bank AG, financial advisors to BAT, referred to as UBS and Deutsche Bank, respectively, to discuss potential pro forma ownership." There is no indication that any of the BAT Designees recused themselves from this call. It

appears that the Other Directors had not retained independent counsel or an independent financial advisor prior to Lazard initiating negotiations with UBS and Deutsche Bank regarding BAT's stake in the combined company.

53. Indeed, the Preliminary Proxy does not reference any separate action by the Other Directors—other than a separate vote on the 2013 Term Sheet—until January 18, 2014, more than a year after serious discussions began. On January 18, 2014, the Other Directors held a telephone meeting with Lazard, Jones Day, and Richards Layton separately from the other Reynolds directors.

54. That same day, a "representative of Lazard . . . introduc[ed] a [possible] alternative approach in which cash available as consideration would be distributed on a pro rata basis to Lorillard shareholders and to RAI shareholders other than BAT." Lazard also reported on discussions regarding "potential solutions that would be in the best interests of RAI shareholders other than BAT and continue to meet the objectives of both Lorillard and BAT. These discussions included the possibility that BAT and/or RAI shareholders other than BAT could have decreased post-closing ownership interest in the combined company." This appears to be the first time that the Reynolds Board considered the obvious tension between the interests of BAT and the Public Shareholders.

55. According to the Preliminary Proxy, the Other Directors did not discuss obtaining independent counsel until February 2014. During meetings between February 4 and 7, 2014, "[r]epresentatives of Lazard presented a variety of modifications to the proposal made in December in connection with the exploration of an alternative proposal to present to Lorillard. The modifications considered included providing a premium on cash paid to Lorillard shareholders, a premium on shares of RAI common stock issued, changes to the BAT investment and incremental changes to RAI's leverage and

cash allocation. It was the consensus of the Other Directors that RAI shareholders other than BAT should receive at least 30% of the equity ownership of the combined company and ***receive a pro rata portion of the cash distribution***. The Other Directors discussed engaging independent legal counsel."

56. The Other Directors finally engaged separate legal counsel on February 12, 2014—retaining Moore & Van Allen. Based on the Preliminary Proxy, however, it appears that the Other Directors *never* retained any independent financial advisors. Moreover, as set forth below, Moore & Van Allen appears to have frequently been excluded from crucial negotiations.

57. At the February 12, 2014 meeting of the Other Directors, "[t]here was extensive discussion regarding the consideration to be received by RAI shareholders other than BAT and BAT's willingness to move from its initial position regarding post-transaction equity ownership." According to the Preliminary Proxy, later in February 2014, there were discussions regarding a proposal to provide extra equity to Lorillard shareholders by reducing BAT's stake: "the ownership level of Lorillard shareholders in the combined company would be approximately 36.5%, with RAI shareholders other than BAT and BAT holding approximately 30% and 33.5% of the outstanding common stock of the combined company, respectively" (subject to a provision allowing BAT to subscribe for additional shares in phases over two years).

58. Ultimately, however, BAT's ironclad control over the Board won out. The Public Shareholders will receive *no* separate consideration and BAT did not move from its initial position regarding post-transaction equity ownership.

59. Similarly, during the course of discussions in February 2014, "[r]epresentatives of Cravath[, BAT's attorneys,] indicated that BAT was not prepared to extend the standstill covenant in the governance agreement in

connection with the proposed business combination transaction[.]" As with its other demands, BAT got its way. The Standstill would still expire on schedule on July 30, 2014.

60. On March 10, 2014, the Lorillard board met and discussed the fact that the proposed transaction was not appropriately viewed as a merger of equals given BAT's control over the combined company. According to the Preliminary Proxy, Lorillard's board believed that the proposed transaction would not be a merger-of-equals because "BAT would continue to be the most significant shareholder of the combined company with the right to board representation in accordance with the governance agreement and . . . BAT would resist agreeing to an extension of the standstill agreement in the governance agreement[.]"

61. On March 13, 2014, the Lorillard board "determined not to proceed with the proposed business combination transaction and to terminate the related discussions with RAI, BAT and Imperial. Among other things . . . the Lorillard board of directors did not believe that the proposed transaction in fact reflected a 'merger-of-equals'-like transaction[.]" Lorillard informed Reynolds of its decisions and discussions between Lorillard and Reynolds ceased until May 10, 2014.

62. On May 1, 2014, Ms. Cameron was elected CEO of Reynolds, following Mr. Delen's retirement.

63. The Preliminary Proxy states that on May 7, 2014, "the Other Directors met with RAI senior management, representatives of RAI's outside legal and financial advisors and Moore & Van Allen to consider further the possibility of an acquisition of Lorillard." The Preliminary Proxy claims that "[t]here was extensive discussion, among other things, of the potential benefits to [the Public Shareholders] of BAT's commitment to purchase additional shares of RAI common stock as part of the financing for the proposed transaction, including that

it was unlikely RAI would be able to obtain equity financing from a third party on terms as favorable as those offered by BAT."

64.    There is no indication in the Preliminary Proxy, however, that Reynolds, its advisors or the Other Directors had, at this point, (i) compared the terms of BAT's proposed equity financing to potential *debt* financing options that might be available (including the potential tax benefits thereof); (ii) actually contacted other potential sources of equity financing or (iii) determined that BAT was unwilling to offer more favorable terms.

65.    According to the Preliminary Proxy, the Reynolds Board dissolved the SMRC on May 7 or 8, 2014 "in light of the role required by the governance agreement of the Other Directors in considering the transaction and the fact that the SMRC was not otherwise operative at this time."  The Preliminary Proxy does not explain why it was appropriate for the SMRC—instead of the Other Directors—to act on behalf of Reynolds, for approximately a year and a half prior to May 2014, during which period all of the fundamental aspects of BAT's role in the Proposed Transaction were negotiated.

66.    On May 10, 2014, Mr. Wajnert sent Mr. Kessler a proposal for Reynolds to acquire Lorillard for cash and stock worth approximately $65 per share.  The proposal provided for BAT to maintain its 42% stake in exchange for an additional cash investment of approximately $5 billion.

67.    Reynolds and Lorillard engaged in negotiations over this proposal between May 15 and May 20, 2014.  "Representatives of Centerview [Lorillard's financial advisor] telephoned representatives of Lazard and indicated that Mr. Kessler would be prepared to discuss with the Lorillard board of directors the proposed acquisition if RAI increased its offer to $68 per share."

68.    At a May 20, 2014 meeting of the Reynolds

Board, Reynolds's Directors "determined it would not agree to a 'reverse' termination fee"—which was, of course, one of BAT's conditions—but authorized a proposal to Lorillard with a range of $67 to $68 per share. The Preliminary Proxy states that, during the discussions, "representatives of BAT on the RAI board of directors reported, on behalf of BAT, support for the proposed transaction at the higher price."

69. The fact that the BAT Designees were designated by BAT does not change the fact that they owed independent fiduciary duties to Reynolds and its public shareholders. It was inappropriate for the BAT Designees to act "on behalf of BAT," in any capacity, while acting as members of the Reynolds Board. That the BAT Designees were speaking for BAT while sitting as Reynolds directors in a Reynolds board meeting underscores BAT's dominance over Reynolds's decision making.

70. On May 27, 2014, Reynolds and Imperial executed a non-binding memorandum of understanding with respect to the proposed asset sale. According to the Preliminary Proxy, "Over the next several weeks, representatives of RAI, Imperial, Lorillard, and in some cases BAT, engaged in discussions regarding the divestiture transaction, including with respect to 'route to market,' reciprocal contract manufacturing and other commercial arrangements." Then, "[f]rom June 11, 2014 through July 15, 2014, legal counsel to RAI, BAT and Lorillard, with the assistance of RAI's and Lorillard's senior managements and financial advisors, engaged in extensive negotiations concerning, and exchanged numerous drafts of, the proposed merger agreement and its key terms, including the allocation of antitrust risk and required efforts in the proposed transaction."

71. The Preliminary Proxy identifies only one specific recommendation made by the Other Directors during this period. That recommendation was ultimately rejected. According to the Preliminary Proxy, "on July 2, 2014, Moore & Van Allen reviewed the proposed draft of

the subscription and support agreement with the Other Directors, who requested that BAT's draft provision for an unconditional commitment to vote the shares of RAI common stock it beneficially owned in favor of the transaction (regardless of any change in recommendation of the RAI board of directors) be deleted." Yet, on July 5, 2014 "Simpson Thacher [counsel for Lorillard] advised Jones Day [counsel for Reynolds] that Lorillard was insistent, as a condition of proceeding, on having a commitment from BAT to vote the shares of RAI common stock it beneficially owned in favor of the transaction even if the RAI board of directors changed its recommendation of the transaction. Cravath [counsel for BAT] advised Jones Day that BAT would consider this demand but would not give such a commitment over the objections of the Other Directors. The Other Directors agreed to accept that commitment."

72. The Preliminary Proxy suggests that even after Moore & Van Allen—independent counsel to the Other Directors—was retained, the firm was frequently excluded from discussions amongst counsel for the parties. For example:

- Between February 20 and February 24, 2014, "representatives of Jones Day [for Reynolds], Cravath [for BAT] and Simpson Thacher [for Lorillard] began to discuss the outlines of other potential terms in the 'merger-of-equals'-like transaction.";

- "[C]ommencing on May 21, 2014, representatives of Jones Day, Cravath and Simpson Thacher began discussing various process matters, including those relating to structure, due diligence, documentation and various matters relating to the Imperial asset divestiture.";

- "On June 3, 2014, representatives of Jones Day, Cravath and Simpson Thacher held a

telephonic meeting to discuss certain legal matters, ***including the potential key terms of the definitive transaction agreements*** expected to be entered into among the parties, including the allocation of antitrust risk and required efforts."; and

· "On July 5, 2014, . . . representatives of Jones Day, Cravath and Simpson Thacher met to discuss the proposed merger agreement, ***including the allocation of antitrust risk*** and required efforts in the proposed transaction, and the status of the other definitive transaction documents, including the subscription and support agreement"

73.    The Other Directors should have insisted— yet apparently did not—that Moore & Van Allen be included in every discussion amongst counsel for the parties, including those listed above.

74.    On July 13 and 14, 2014, the Other Directors reviewed and unanimously approved the Proposed Transaction.    They did not retain any independent financial advisor to assist them in evaluating the fairness of the Proposed Transaction to the Public Shareholders. The Reynolds Board also unanimously approved the Proposed Transaction.

II.    **THE PROPOSED TRANSACTION UNFAIRLY BENEFITS BAT AT THE EXPENSE OF PUBLIC SHAREHOLDERS**

   A. **The Proposed Transaction Will Give BAT Access To Reynolds's "Game-Changing" E-Cigarette Technology Without Adequately Compensating Public Shareholders**

   . . . .

### B. The Proposed Transaction Will Dilute Public Shareholders But Permit BAT To Retain Its Blocking Position Without Paying A Control Premium

. . . .

87.     Under the terms of the Subscription and Support Agreement dated as of July 15, 2014, BAT will purchase the additional shares at a reference price of $60.16 per share.   This is $3.02 per share ***less*** than Reynolds's closing price on July 14, 2014 of $63.18 per share—representing a ***negative*** 4.8% premium.   In a truly arm's-length negotiation, Reynolds should have required BAT to pay a significant, ***positive*** premium to purchase sufficient shares to maintain its controlling blocking position.

Construing the complaint liberally and drawing every reasonable inference therefrom, the complaint alleges that BAT used its significant forty-two percent minority stake (the Preliminary Proxy, incorporated by reference, reveals that the next largest ownership block was five percent) and its veto power over the board to dictate the terms of the Lorillard acquisition in order to enrich itself at the expense of other shareholders, namely, by gaining access to Reynolds's lucrative e-cigarette technology and by maintaining its acquisition share while other shareholders' shares were diluted.  The complaint further alleges that BAT employed additional coercive leverage to control the board in the Lorillard acquisition, including by implicitly threatening a takeover of Reynolds made possible by the impending expiration of the Standstill, as well as by acting as a major source of financing for the transaction.  The

complaint also alleges that during discussions the representatives of BAT on the board spoke "on behalf of BAT," in contravention of their fiduciary duties as board members, further underscoring BAT's coercive influence over the board. Finally, the complaint alleges that, as a result of BAT's control of the board in this transaction, the other board members (several of whom are alleged to have close ties with BAT) delayed in retaining separate legal counsel and then failed to adequately utilize that counsel, never retained an independent financial advisor, never received a separate fairness opinion regarding the BAT share purchase, and never considered other options to finance the transaction besides BAT equity financing. In my view, "[i]n light of the low bar for notice pleading under Rule 12(b)(6)," *Wray*, 370 N.C. at 50, 802 S.E.2d at 900, these allegations are more than sufficient to allege that BAT exercised actual control over the board and prevented the board from "freely exercising its independent judgment" in considering the Lorillard acquisition.

The majority recognizes that the complaint alleges that BAT possessed significant veto power and used this to its advantage in the transaction, but the majority concludes that in the absence of "other factors," the veto power, as the mere exercise of a contractual right, cannot alone support a finding of actual control. *See Super. Vision*, 2006 WL 2521426, at *5 ("There may be circumstances where the holding of contractual rights, coupled with a significant equity position and other factors, will support the finding that a particular shareholder is, indeed, a 'controlling shareholder,' especially if those contractual rights are used to induce or to coerce the

board of directors to approve (or refrain from approving) certain actions."). In light of the complaint's allegations of the threat posed by an acquisition of Reynolds by BAT, BAT's role as the major source of equity financing, and the alleged "inappropriate" role played by representatives of BAT on the board, I conclude these allegations include such other factors.

The majority dismisses any alleged leverage over the board posed by the threat of a takeover of Reynolds by BAT, asserting that the complaint merely alleges that news outlets reported on "speculation" of a takeover and that the complaint fails to allege that BAT actually threatened Reynolds with purchasing the remaining shares at the end of the Standstill period. The majority further asserts that "BAT could not seek to remove any of the directors that it did not nominate" and "therefore had no means of retribution against the majority of the directors that could have impaired the ability of those directors to exercise independent judgment." In my view, the majority reads the complaint's allegations regarding the threat of a takeover too narrowly and also ignores the fact that the restriction on BAT's seeking to remove any of the Other Directors, similar to the prohibition on BAT increasing its ownership percentage, was one of the governance agreement restrictions set to expire with the impending cessation of the Standstill period, which, according to the complaint, " 'BAT was not prepared to extend[.]' . . . As with its other demands, BAT got its way. The Standstill would still expire on schedule on July 30, 2014." Following the expiration of the Standstill period, BAT could seek the removal of Other Directors, or

it could effect their removal by doing precisely what the Standstill had prevented for ten years—acquiring Reynolds. As the complaint alleges, "[t]he timing of the Proposed Transaction is no coincidence." Turning back to the complaint, which alleges regarding the control exercised over the board by the threat of a takeover:

> 3. The Proposed Transaction is Reynolds's first significant strategic transaction since 2004. The Proposed Transaction was announced just two weeks before the expiration of a ten-year *standstill provision (the "Standstill") that prevented BAT from purchasing the Company in its entirety.*

> 4. The timing of the Proposed Transaction is no coincidence. The Proposed Transaction forestalls a takeover by making Reynolds a significantly less attractive takeover target for BAT.

> . . . .

> **A.** ***The Impending Expiration Of The Standstill Put The Directors' Jobs At Risk***

> 32. Reynolds was created as a result of the 2004 acquisition of BAT's U.S. subsidiary, B&W, by Reynolds's predecessor entity, the R.J. Reynolds Tobacco Company. As part of the Brown & Williamson Acquisition, BAT acquired a 42% stake in Reynolds.

> 33. In connection with the Brown & Williamson Acquisition, BAT and Reynolds adopted a July 30, 2004 Governance Agreement (the "Governance Agreement"), which included *a provision that prohibited BAT from increasing its percentage ownership of Reynolds until July 30, 2014—i.e., the Standstill.*

> . . . .

37.    . . . . BAT cannot replace the Reynolds Board in its entirety without purchasing 100% of the Company.

38.    In the weeks leading up to the expiration of the Standstill, there were reports suggesting that BAT might be interested in doing just that.  On March 10, 2014, the Telegraph reported that Citigroup analysts had "talked up the likelihood" that BAT would buy the remaining 58% of Reynolds.  At BAT's annual shareholder meeting in April 2014, BAT CEO Nicandro Durante made a point of noting that BAT looks at acquiring Reynolds on a yearly basis.  Such commentary resurfaced in early July 2014 when the Daily Mail reported on "growing speculation [that BAT] is ready to splash out billions of pounds buying the 58 per cent of US rival Reynolds American it does not already own."

39.    At the time of these reports, the Proposed Transaction was already being negotiated.  *The threat of a complete takeover gave BAT additional leverage to impose its terms on the Reynolds Board during those negotiations.*

40.    *The Director Defendants adopted a plan that had the purpose and effect of allowing them to keep their jobs.*  On July 15, 2014, Reynolds issued a press release announcing the Proposed Transaction[.]

. . . .

93.    . . . .

- All members of the Reynolds Board have an incentive to safeguard their comfortable and lucrative positions, which could be lost in the event of a BAT takeover of Reynolds.

. . . .

97.    As detailed in the Company's most recent annual proxy, Reynolds's non-officer directors are paid hundreds of thousands of dollars each year to serve on the

Board[.]

(Emphases added.) Construing these allegations liberally, there appears to be more than a reasonable inference that the threat of a takeover of Reynolds by BAT loomed large; indeed, the specter of a BAT takeover would seem to be a familiar shadow to Reynolds by then, given that it was apparently the entire purpose of the ten-year-old Standstill provision. In my view, the distinct message of plaintiff's allegations is that after the expiration of the Standstill period a takeover could well follow along with the loss of a board position if the Other Directors did not agree to BAT's transaction terms in the Lorillard acquisition. These allegations set forth a scenario in which BAT in effect coerced the Other Directors into acceding to exceedingly favorable terms for BAT in order to maintain their positions in the company. The likelihood that plaintiff could ultimately prove these allegations is an entirely different issue, and one on which I express no opinion. The majority appears to focus on likely proof of the allegations, rather than sufficiency of the allegations themselves; our review in accord with Rule 12(b)(6) requires focus on the latter.

In that respect, I note that the majority also asserts that "[p]laintiff does not allege that BAT ever threatened the Reynolds board in any way, however—unlike, for example, the stockholder who was considered controlling in *Kahn*[ ]—even though BAT was involved in many of the discussions regarding the Lorillard transaction from an early date." *See Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1113-15 (Del. 1994) (concluding that a minority stockholder was controlling when the minority

stockholder intimidated the board and at one point threatened them, saying, "[y]ou must listen to us. We are 43 percent owner. You have to do what we tell you."). But *Kahn* was not decided on a motion to dismiss for failure to state a claim; rather, the Court of Chancery determined that the minority stockholder was controlling after a three-day trial. *Id.* at 1111. As the majority states, "[t]here was also *evidence* in *Kahn* that board members were intimidated by this stockholder and therefore complied with its demands instead of exercising their own independent business judgment." An explicit statement like the one in *Kahn*, or testimonial evidence that board members were intimidated, would certainly be beneficial to a claimant in plaintiff's position, but these are examples of evidence that will only be made known or available through discovery or at trial.

On the other hand, portions of the complaint pertaining to information available to a stockholder situated like plaintiff are summarily dismissed by the majority. For instance, plaintiff alleges that the other board members delayed in retaining separate legal counsel and then failed to adequately utilize that counsel, never retained an independent financial advisor, never received a separate fairness opinion regarding the BAT share purchase, and never considered other options to finance the transaction besides BAT equity financing. The majority briefly touches on some of these allegations but concludes that because they focus on the actions of the Other Directors rather than on the actions of BAT, these allegations "would *in no way show* that BAT" exercised actual control of the board in the Lorillard transaction.

(Emphasis added.)  Given that plaintiff—with his allegations that BAT dictated the terms of the Lorillard transaction by means of its significant forty-two percent minatory stake, its veto power over the board, its role as a major source of equity financing for the transaction, and the threat of a takeover and the termination of the Other Directors following the expiring Standstill, as well as the allegation that BAT's representatives on the Board acted in breach of their fiduciary duties—has alleged that BAT exercised actual control of the board in this transaction, i.e. "prevent[ing] the [company's] board from freely exercising its independent judgment in considering the [transaction]," *In re KKR*, 101 A.3d at 995, and given that these allegations reflect that the other board members were in fact not "freely exercising [their] independent judgment," *id.*, I find perplexing the majority's conclusion that such allegations are essentially irrelevant.

Similarly, with regard to the complaint's allegations of the "Technology Sharing Agreement" concerning "the development and commercialization of next-generation tobacco products, including heat-not-burn cigarettes and vapor products," the majority dismisses these allegations with an oft-repeated refrain, stating "[a]gain, though, leverage to obtain favorable terms in an agreement does not necessarily indicate that the beneficiary of those favorable terms was a controlling stockholder." Indeed, in the majority's view, nearly everything can be reduced to the "mere existence of leverage." *See In re Sea-Land*, 1988 WL 49126, at *3 ("Plaintiffs allege only that LLC and its affiliates had significant 'leverage,' (*i.e.*, a superior bargaining

position) because they owned 39.5% of Sea-Land's stock. But 'leverage' is not actual domination and control."). But as the majority recognizes elsewhere in its opinion, a minority stockholder may employ means beyond its mere ownership percentage or contractual rights that amount to "coercive leverage" and actual control over the board. *See Williamson*, 2006 WL 1586375, at *5 ("Cox and Comcast's potential veto power is significant for analysis of the control issue, however, because it supports plaintiff's allegation that Cox and Comcast had *coercive leverage* over At Home. Cox and Comcast had the ability to shut down the effective operation of the At Home board of directors by vetoing board actions. Plaintiff may be able to prove facts showing that this leverage (together with the special business relationships and other circumstances mentioned above) was enough for Cox and Comcast to obtain a far better deal th[a]n they would have in an arm's-length transaction." (emphasis added)). In light of the allegations of coercive leverage discussed above, I also view as relevant the allegations regarding the "Technology Sharing Agreement," which is alleged to have been significant, if not vital, to the Lorillard transaction; these allegations demonstrate that BAT was able "to obtain a far better deal th[a]n [it] would have in an arm's-length transaction." *Id.*

For instance, the complaint included numerous allegations about the importance to Reynolds of its "game-changing" VUSE brand of e-cigarettes, as well as its heat-not-burn technology, asserting that e-cigarettes are "the future of the tobacco industry" and that before the Lorillard acquisition, Reynolds was predicted

to "have $4 billion in revenue from e-cigs in 2021, compared with $3.9 billion from conventional cigarettes." The complaint alleges further that news reports prior to the transaction had recognized that "gaining access to Reynolds's e-cigarette and heat-not-burn technology was one of the primary reasons that BAT might want to buy the Company." Due to BAT's control of the board, however, "the Director Defendants have agreed to allow BAT to access Reynolds's game-changing technology without adequate compensation, [and] there is no need for BAT to pay the Public Shareholders a control premium to buy the rest of the Company." The complaint alleges that this "forestalls a takeover by making Reynolds a significantly less attractive takeover target for BAT," or in other words, it allows BAT to "get the milk without buying the cow." Based on these allegations, I disagree with the majority's assertion that "it is unclear how this agreement demonstrates that BAT had actual control of the Reynolds board with respect to the transaction to purchase Lorillard."

In sum, looking solely at the allegations in the complaint and taking them as true, I conclude that plaintiff has sufficiently alleged actual control by BAT over the board in the Lorillard acquisition. As such, I respectfully dissent.

Justices BEASLEY and MORGAN join in this dissenting opinion.